## Case No. 2,917.

### COATES v. MUSE et al.

[1 Brock. 539.] [1]

·Circuit Court, D. Virginia.  May Term, 1822.

DECREE AGAINST EXECUTORS—UNEQUAL LIABILITY —CONSTRUCTION OF STATE STATUTE.

1. Where a decree has been entered against two executors jointly, the effect of the decree is to charge each executor equally, whether it is so expressed, or not; but on an application, ·at a subsequent time, to carry the decree into effect, if it be shown by proof that the defendants were unequally indebted, the decree will be revived against each, according to his liability.  But the fact, that the executors were debtors to the estate, in unequal sums, for purchases made at the sale of the estate, is no proof of their unequal liability.

2. Quaere: Is a joint decree against two persons, one of whom dies before the decree is carried into effect, within the influence of the Virginia act of assembly, "concerning partitions, joint rights, and obligations" (1 Rev. Code, c. 98, § 3), so that it may be revived against the representatives of the deceased defendant; or are those representatives discharged, notwithstanding the act of assembly?

3. The exposition of the acts of the several state legislatures, is the peculiar and appropriate duty of the state courts, and the federal courts will always feel great reluctance in breaking the way in the exposition of such statutes, and will not do so, unless really necessary for the decision of the cases before them.

[Cited in Beals v. Hale, 4 How. (45 U. S.) 54. Quoted in Johnston v. Straus, 26 Fed. 69.]

4. Construction of the 60th section (1 Rev. ·Code, c. 104) of the act "concerning executors," &c.  B, the executor of A, commits a devastavit of the estate of his testator.  C, the executor or administrator of B, is bound to pay the ·debts due to the estate of A, before any proper debts due to B's own creditors.  Although the words of the section require the executor, or administrator of the executor, &c., to pay what shall be due to legatees, or distributees, of the first decedent; yet it is clear, that those debts may be paid to the executor, or administrator of the first decedent, as well as to his legatees, and distributees.  And this superior dignity of debts due to the first decedent, attaches as well to the creditors of that decedent, as to his personal representative, and those creditors may sue the representatives of the last executor or administrator, and make him liable for the amount of their claims.

[Cited in brief in Johnston v. Straus, 26 Fed. 67.]

This is the same case reported in 1 Brock. 529 [Case No. 2,916], quod vide.  In pursuance of the decree of the 4th of June, 1821, the commissioner made his report, and the court, reserving to a future day its decision, on the ultimate responsibility of the parties, in December, 1821, rendered an interlocutory ·decree, directing the administrator of Elliott Muse, to pay the sum of $3731.32 to the plaintiff, out of the assets of Elliott Muse's estate,

unadministered by him.  At the present term, the administrator exhibited to the court, the copy of the record of proceedings, in two suits then pending in a court of chancery of the state, and moved the court to set aside the interlocutory decree, of December, 1821, subjecting the assets in his hands, of the estate of Elliott Muse, to the payment of the claim of the plaintiff in this cause.

MARSHALL, Circuit Justice.  The first question which arises in this cause is:  In what proportion was the debt due to the plaintiff, originally chargeable on the estate of Thomas and Elliott Muse?  By the decree of this court, at the May term, 1811, Thomas and Elliott Muse, administrators of Hudson Muse, deceased, were directed to pay to the plaintiff, the sum of $7493.76, that being the amount of the assets of Hudson Muse in their hands, to be administered.  This decree is not expressed to be made by consent of parties; but there is much reason to believe that such was the fact.  In general, one executor is not liable for the acts of his co-executor, and it is certain that this court would not have made a joint decree against the defendants, had not an acquiescence in such decree been expressed; or had not the court understood, that there would be so much difficulty in ascertaining their respective liabilities before a commissioner, that the defendants preferred making the adjustment between themselves.  But, whatever may have been the motive for the decree, its effect certainly was to charge Thomas and Elliott Muse equally.  It cannot, however, be doubted, that if, on an application to carry this decree into execution, it should be shown to the court, that the defendants were unequally indebted to the estate of the deceased, the decree would be revived against each, according to his liability.  The commissioner has supposed, that this inequality of liability is proved by the fact, that Thomas and Elliott Muse, were debtors in unequal sums, for purchases made at the sale of Hudson Muse's estate.  He supposes, that precisely the same amount of debts was collected by each, and that Thomas Muse is chargeable beyond Elliott Muse, in the sum which his purchases exceed those made by Elliott Muse.  This supposition the court considers as inadmissible, because the defendants would have resisted a joint decree, had they divided the outstanding debts, without regard to their individual debts; and, because also, it is most probable, especially since they considered themselves as entitled to the estate of Hudson Muse, that each collected as much of the outstanding debts, as would place him on an equality with the other.  The fact, then, that they purchased unequally at the sale, does not authorize any inference, opposed to the decree of 1811.  The entry made by Elliott Muse, as representative of Thomas Muse, is undoubtedly satisfactory evidence, that he did not think the estate of

Thomas Muse liable to him beyond the sum charged to it; but does not, perhaps, sufficiently prove, that the estate of Thomas Muse was indebted in that sum.[2] That entry shows the extent of Elliott Muse's claim, when he supposed himself entitled to the decree, but cannot demonstrate the justice of that claim. The sum charged to the estate of Thomas Muse, however, exceeds so little a moiety of the decree, with interest, as to make this an unimportant inquiry. 1 shall consider Thomas and Elliott Muse, as originally liable for this decree in moieties.

The second question, depends upon the construction of the "act concerning partitions, and joint rights, and obligations." Soon after the decree was pronounced, Thomas Muse died; and the question is, whether the decree survived, so that his representatives were discharged at law; or, whether it might have been revived as against them. At common law, the rule undoubtedly is, that a judgment or decree against two persons, is joint and not several, that it survives against the survivor, and cannot be enforced, at law, against the representatives of the deceased; nor in equity, farther than those representatives are equitably bound, in consequence of being equitable debtors. But the legislature of Virginia, has enacted, that, "the representative of one jointly bound with another, for the payment of a debt, or for performance or forbearance of any act, or for any other thing, and dying in the lifetime of the latter, may be charged by virtue of such obligation, in the same manner as such representatives might have been charged, if the obligors had been bound severally, as well as jointly." 1 Rev. Code, c. 98, § 3. The question is, whether this section of the act, extends to judgments and decrees, or is confined to obligations, created by the act of the party bound. This question, as I understand, is now, for the first time, raised in a court of justice. It is always, with much reluctance, that I break the way, in expounding the statute of a state; for the exposition of the acts of every legislature is, I think, the peculiar and appropriate duty of the tribunals, created by that legislature. Although, if a case depending on a statute, not yet construed by the appropriate tribunal, comes on to be tried, the judge is under the necessity of construing the statute, because it forms a part of the case, yet he will yield to this necessity, only where it is real, and when the case depends upon the statute. The reluctance with which he yields to it is increased, when, as in this case, the language of the act is sufficiently ambiguous to admit of different constructions among intelligent gentlemen of the profession. In such a case, he will be particularly anxious to avoid giving a first construction; and will

avoid it, if the case can be otherwise decided. "The representative of one jointly bound with another," is the subject of the act; and this description is, certainly, broad enough to comprehend a person bound by act of law, as well as one who is bound by his own act. The statute proceeds: "May be charged, by virtue of such obligation, in the same manner as such representatives might have been charged, if the obligors had been bound severally, as well as jointly." These words may be considered as restraining the general term used in the first part of the sentence. It is true, that the words "such obligation," referring, directly, to the words "one jointly bound with another," very naturally have been used in a sense co-extensive with the first words, and may, without violence, or departure from their usual sense, be understood to designate any obligation, whether created by the act of law or of a party; but the subsequent words produce more difficulty. The representatives of the person dying first, are to be charged in the same manner as they might have been charged "if the obligors had been bound severally, as well as jointly."

The word "obligors," in the last part of the sentence, was certainly intended to be co-extensive with the words "one jointly bound with another," in the first part of it. These different words were, unquestionably, introduced by the legislature, to describe the same persons and the same obligation; but the word "obligors" seems to me to designate, exclusively, those who bind themselves, the actors, in creating an obligation. Those bound by a judgment or decree, are never, I think, denominated obligors. The following words add strength to this construction. They are to be charged, as if the obligors had been bound "severally as well as jointly." Now, a judgment never, and a decree very rarely, binds severally as well as jointly. A judgment, or decree, against two, is a joint, and never a joint and several judgment or decree; unless, indeed, in a decree, this quality be particularly expressed. These phrases in the section, which are entirely adapted to obligations created by the act of the party, satisfy me, that such obligations, alone, were in the mind of the legislature, when the law was framed; and I should feel no difficulty in saying, that its provisions ought to be limited to them, were it not that the obvious and general intention of the act would be defeated by this construction.

The obvious intention of the act is, that all obligations, which are joint in their terms, should be several, as well as joint, in their legal operation and effect. This policy is beneficial and just to creditors, because they are not defrauded, by the death of one of the obligors, of any part of the security for which they originally stipulated; and it is justice to the obligors themselves, because it leaves the representatives of each, bound to precisely the same extent to which the original obligor

---

[2] In relation to this entry, see the last opinion of the chief justice, in 1 Brock. 551 [Case No. 2,918].

probably intended to bind himself. The legislature stops short, without effecting its object, if the provision does not apply to the judgment, as well as to the contract on which that judgment is founded. It would be strange, if, in severing that which the parties themselves had made joint, the legislature had intended to leave the law in such a state as still to join, by its own operation, that which the parties had severed, or that which the act was made for the purpose of severing. If the legislature, when framing this law, had been asked: "Do you intend, that a judgment shall bind those jointly, and not severally, who had bound themselves severally, as well as jointly; or that the judgment shall be joint on contracts which this legislature intended to sever?" the answer, it is probable, would have been in the negative. It may, then, be urged with plausibility, and, perhaps, with truth, that this is a case in which the literal construction of an act is opposed to its spirit, and would defeat, in part, the object of the legislature; that it is a case in which words of some ambiguity are used, which, construed according to their common acceptation, would not reach a case within the mischief intended to be provided against. I feel the force of this reasoning, but my general rule of construction, and I think it a good one, is to adhere to the letter of the statute, taking the whole together; and I would not readily depart from that rule in this case. It is, however, no weak argument in favour of the more liberal construction, that no mischief can come from its adoption, and the consequence of a contrary construction, would, I think, be the multiplication of suits. Creditors would bring, in many instances, as many actions as there are parties to the contract on which they sue. Without expressly adopting either construction I shall inquire whether the one or the other may not lead to the same result. If the act of assembly so changes the law, that this decree may be revived against the representatives of Thomas Muse, then those representatives would be clearly liable for one moiety of it; but if, in consequence of transactions subsequent thereto, or of circumstances not known to the court when it was pronounced, the representatives of Thomas Muse ought to recover from those of Elliott Muse, the sum they pay to the plaintiff, or any part of it, then the court would decree, in the first instance, that the estate of Elliott Muse should pay to the plaintiff, the sum for which they would be liable to the estate of Thomas Muse, provided that might be done without delaying the plaintiff, or in any manner prejudicing him.

If the decree survives, and could not be regularly revived against the representatives of Thomas Muse. still the original equity of the plaintiff against him for a moiety of the decree, would not be destroyed. This equity may indeed be rebutted by equitable circumstances; but those circumstances must, I think, derive some of their force from the conduct of the creditor. Transactions between the debtors alone, might be a reason for decreeing in the first instance against the estate of one of them, but not for such a postponement of the rights of the creditor as would materially injure him. We should be brought, then, to the same result in whichever way the statute be construed, unless there are transactions between the parties, which ought to postpone the decree, as against the estate of Thomas Muse, under one construction, and not under the other. His counsel contends that there are such circumstances. On the death of Thomas Muse, Elliott Muse qualified as his executor, and has died greatly indebted to his estate. It is contended that as the representatives both of Thomas and Elliott Muse are before the court, and as the representatives of Elliott Muse, will be accountable to those of Thomas Muse, for the estate of Thomas Muse wasted by Elliott Muse, that this court will decree directly against those representatives, so far as they are liable to the representatives of Thomas Muse. This is undoubtedly the course of justice, and the course of the court, so far as it can be conformed to, without delays and perplexities injurious to the creditor. In a plain case, the court will never hesitate to decree directly against a party, who is ultimately responsible. But in a case where great delay must be encountered to establish this ultimate responsibility, the court does not think itself at liberty to impose these delays and difficulties on the creditor. If Elliott Muse were still living, and the report of the commissioner were to be confirmed, the court could not hesitate to decree against him to the full amount of the debt, for he is shown to be the debtor of Thomas Muse in a still larger sum. But Elliott Muse is dead, and his representatives are responsible under any construction of the laws of Virginia, so far only as assets have come to their hands. Whether they are responsible to that extent, or not, depends upon the construction of the 60th section of the act (1 Rev. Code, c. 104) for regulating the conduct of executors and administrators, and on the operation of a paper given to Elliott Muse by William C. Williams, then the attorney for the plaintiff. The words of the act of assembly are, "The executors or administrators, of a guardian, of a committee, or of any other person who shall have been chargeable with, or accountable for, the estate of a ward, an idiot or a lunatic, or the estate of a dead person, committed to their testator or intestate, by a court of record, shall pay so much as shall be due from their testator or intestate, to the ward, idiot, or lunatic, or to the legatees or persons entitled to distribution, before any proper debt of their testator or intestate."

The question is, whether the priority given by this section, extends to creditors, or is confined to the claims of the ward, idiot, &c. and legatees or distributees of the de-

ceased. In the case of a ward, or of an idiot or lunatic, the question cannot well arise; and I am not sure that this circumstance may not in some degree, affect the construction of the act, in its application to the case of legatees and distributees, who are thus connected in the same provision with the ward, and the idiot or lunatic. There are, however, some considerations, which powerfully oppose this construction of the act. The executor, or administrator, holds the estate of his testator, or intestate, as a trustee, first for creditors, and, then, for legatees, or distributees. This rule is so intermingled with all the principles of our law, its observance is so imperiously exacted by the most sacred injunctions of justice and morals, that the legislature cannot be supposed to impair it, unless the language be such, that the construction is inevitable. Express words, only, can change the order which debts and legacies, or distributive shares hold to each other. The executor of an executor, is often the executor of the first testator. The debt due from his immediate, to his original testator, represents the property converted by that immediate testator, to his own use, and is assets in his hands, first, to satisfy the claim of the creditors of the first testator, and then, the claims of legatees. In a contest between those creditors and legatees, all our experience, all our legal education, every thing we derive from observation or instruction, informs us, that the creditors must prevail. In such a state of things, the priority of a legatee over a creditor of the last testator, is, by an implication so necessary as to be inevitable, the priority of a creditor of the first testator, whose claim is so superior in dignity, to that of the legatee, as to enable him to wrest the property from the legatee, after it shall be delivered to him.

The case is not materially varied, if the representative of the administrator, or of the last testator, be not also the representative of the first. If an executor or administrator die, indebted to the estate of his testator, or intestate, that debt charges his estate in the hands of his representative. It is a debt, the dignity of which depends upon the law. This debt, in the regular course of things, is to be sued for, by the representative of the original testator. When it comes to the hands of that representative, it is assets to be paid in the course of administration, first to creditors, and then to legatees, or distributees. The law must be very clear, and very positive, indeed, which would make a difference between these assets, and those which had remained unchanged, and which came to his hands, as they came to the hands of the first representative. If we examine the section under consideration, it makes no such difference. It does not say, that the executor or administrator, shall pay to the legatees, or distributees, as much as shall be due from their testator, or intestate, before any

other debts whatever. It does not reverse the long established order of things, and give a preference under any circumstances, to a man's legatees, or distributees, over his own creditors; but declares, that the executors, or administrators of any person, "who shall have been chargeable with, or accountable for," "the estate of a dead person, committed to their testator, or intestate, by a court of record, shall pay so much as shall be due from their testator, or intestate, to the legatees, or persons entitled to distribution, before any proper debt of their testator, or intestate." The words, "to the legatees, or persons entitled to distribution," are not connected with the word "pay," but with the word "due." The law does not command, that payment shall be made to the distributees, or legatees, but, generally, that payment shall be made of what is "due to the legatees, or distributees of the dead person," "before any proper debt of their testator, or intestate." Payment shall be made, to whom? The act does not tell us, but the answer must be, to the person authorized by law to receive it. This person is the representative of the original testator, in whose hands this debt becomes assets, not distinguishable from other assets; not more liable than other assets to the claims of legatees, or distributees, nor less liable to the claims of creditors; for the law does not give any priority, except over the proper debts of the last testator, or intestate. For these reasons, I think it impossible to resist the conviction, that this section gives a priority to debts due to the estate of a dead person, committed to the hands of the last decedent in his lifetime, over the proper debts of such decedent, but interferes no farther with the subject. If, then, this suit had been instituted by the representative of Thomas Muse, against the representative of Elliott Muse, the defendant could not, if the foregoing reasoning be just, have resisted the claim, by setting up the payment of the proper debts of his testator, but would have been liable, in like manner, as if the suit had been instituted by the legatees, or distributees of Thomas Muse, against the present defendants. Is the defence the stronger, when made to a suit brought by the creditors? I think it is not. The right of the creditors to bring the suit, cannot be questioned. It is every day's practice, and has not been controverted in this case. If the right to sue be admitted, and the act of assembly, as has been already shown, attaches the superior dignity it gives, to the debt, and not to the character of the plaintiff, it follows, that if the debt be still due, and its priority has not been lost by any act of the creditor, it is of superior dignity to any proper debt of Elliott Muse, and the assets, which have been disbursed in the payment of such debts, have been wasted, and must still be accounted for, by the representative of Elliott Muse.

Decree.—The defendant, Zachariah U. Crittenden, administrator of Elliott · Muse, exhibited to the court the copy of the record of the proceedings, in a suit now pending in the supreme court of chancery for the Williamsburg district, in which Richard M. Segar, sheriff and committee of the estate of Henry Heffernan, deceased, and others are plaintiffs, and the said Crittenden, as administrator of Elliott Muse and others, are defendants, and moved the court to set aside the decree rendered in this cause, on the 19th day of December, 1821, subjecting the assets in his hands, of the estate of Elliott Muse, for the payment of the claim of the plaintiff in this cause. And the court, on consideration of the said motion, doth order, that the same be overruled. And the court being of opinion, that the said decree of the 19th of December, 1821, ought to have directed, that the sum of money therein mentioned, and decreed to be paid by the said defendant, Zachariah U. Crittenden, administrator of Elliott Muse, out of the assets of his intestate in his hands to be administered, if not paid out of the assets of said intestate in his hands to be administered, should be paid out of the proper goods and chattels of the said Crittenden, doth adjudge, order, and decree, as additional to, and amendatory of the said decree, of the 19th of December, 1821, that the sum of money therein decreed to be paid, by the said Crittenden, administrator of Elliott Muse, if the same be not levied of the goods and chattels of the said Elliott Muse, in his hands to be administered, be levied of the proper goods and chattels of the said Crittenden.

[NOTE. For subsequent proceedings had herein, see Case No. 2,918.]